Dorwayne WALL, Appellant,

v.

Troy CARRELL & Wife, Frances Carrell, & L.R. Wells, Appellees.

No. 12-93-00174-CV.

Court of Appeals of Texas, Tyler.

Nov. 30, 1994.

Rehearing Overruled Jan. 11, 1995.

---

**790**

James R. Cornelius, Jr., Lufkin, for appellant.

John H. Seale, Jasper, for appellees.

HOLCOMB, Justice.

This is an appeal from a trespass to try title action. Appellant, Dorwayne Wall ("Wall"), filed suit against the adjoining property owners, Troy and Frances Carrell ("Carrell"), and L.R. Wells ("Wells"), to determine ownership of a 31.4 acre strip of land and to recover damages for timber that was cut on the land in controversy. In seventeen points of error, Wall contends that the trial court erred when it found: (1) that he had failed to establish record title; (2) that Carrell and Wells had standing to challenge his claim for title; (3) that Carrell and Wells were not estopped from denying his claim for title because they had not made a diligent effort to correct title; (4) that Wall failed to prove that he had acquired title by acquiescence; and (5) that Wall failed to establish title by adverse possession, as a matter of law. We will affirm.

It is uncontroverted that the George Wilson survey in San Augustine County contained 160 acres and was patented by the

State of Texas to George Wilson on November 4, 1879. On November 27, 1916, George Wilson conveyed by deed the south portion ("south tract") of the Wilson survey to Nathan Beck, and Beck conveyed by deed to Wilson the north portion ("north tract") of the survey in an effort to partition an undivided interest. Each deed described the property conveyed by metes and bounds, and each tract measured 80 acres. The description of the south boundary line of the north tract and the north boundary line of south tract had identical calls for the corners and "witness trees" on the western and eastern end of the boundary line and described the same course and calculated the same distance between the line and the trees. It is the southwestern and southeastern corners of the north tract that is in dispute.

In 1917, the north tract was conveyed from George Wilson to I.L. Matthews, from Matthews to E.E. Woods, and from Woods to Appellant's father, W.A. Wall. All these conveyances either made reference to or used the same calls to describe the common boundary line that was in the 1916 deed from Beck to Wilson.

As to owners of the south tract, the Beck heirs, in 1948 conveyed 48 acres out of the original 80–acre tract, which was ultimately acquired by Dean Brantley. The remaining 32 acres was eventually deeded from the Beck heirs to Carrell, who conveyed to Wells after reserving timber rights. Again, all south-tract conveyances consistently described the northern boundary line as it was originally described in the 1916 deed from Wilson to Beck.

In 1949, Wall's father employed G.S. Barnum, Jr. and Fred Emerson to survey, plat and prepare field notes on the north tract. According to Emerson, the purpose for making a correction survey in 1949 was "to take and define the boundaries of the land." Using the 1916 description, and attempting to follow the course and distance consistent with the footsteps of the previous surveyor, Barnum and Emerson failed to find the witness trees at the 700 vara [1] point to verify the southwestern corner of the north tract. However, when they walked exactly 100 var-

as farther, they found what appeared to be the originally described trees. Proceeding from this point to follow the surveyor's course to the eastern portion of the tract, they found "stumps" of a pine and hickory tree, which was consistent with the 1916 monuments marking the southeast corner of the boundary line. Convinced that they had followed the original surveyor's course, with the exception of the discrepancy found on the southwestern corner, they staked and marked the west and east corners of the boundary line, remeasured the distance between the stakes and concluded that the original surveyor had made a 100 vara "chaining error." The discrepancy between the Barnum/Emerson survey and the 1916 survey effectively increased Wall's acreage from 80 acres to 111.4 acres and decreased the south tract by 31.4 acres.

At trial, Wall had two surveyors testify. Emerson testified about the manner in which he and Barnum conducted the 1949 survey and concluded that the discrepancies in the 1917 deed to Wall's father and the 1949 survey was a result of a chaining error in the 1916 surveyors' description. Supporting his position, Emerson points out that they found the original witness trees at the west end of the division line, as well as the stumps of the original witness trees at the east end of the division line and honored the original monuments (marked trees), rather than honoring the distance of the 1916 surveyor calls. He and Barnum then attempted to restore the dignity of the original calls by placing marks on existing trees so that the original corners and lines could be more easily located. Harvey Birdwell, a surveyor for Temple–Inland Forest Division, confirmed that he had surveyed the tract in 1958 and verified the witness trees and iron post on the eastern line that Barnum and Emerson had made as monuments in 1949.

To counter Emerson's opinion that the 1916 surveyor had made a 100 vara chaining error, Burl Youngblood, a licensed public surveyor, testified that such a conclusion would presuppose a two-chain error on both the eastern and western sides of the north

---

1. A vara is a Spanish measure of approximately 30 inches.

tract. He further reasoned that any 100 vara error on the common boundary line would have been discovered in 1948 when 48 acres of the south tract was purchased surveyed. In 1990, Carrell hired Youngblood to survey the portion of land that Carrell intended to purchase from Wells. Following the calls in the 1916 deed, Youngblood found no evidence of the witness trees on the common boundary as Barnham had described in 1949, and found that Barnum's calls describing the boundary varied 2 degrees from the course set out in 1916. In calculating the distance of the entire Wilson survey, Youngblood verified that the original Wilson survey contained almost exactly 160 acres. Taking into consideration what appeared to be the intent of Beck and Wilson in the 1916 deeds to each other, and finding no evidence to the contrary, Youngblood concluded that the parties attempted to partition an undivided interest in 160 acres by dividing the property equally and by executing deeds to convey an 80–acre tract. Supporting his testimony that his conclusion was consistent with the parties' intention, he pointed to one of the calls in the 1916 deed describing the south tract which read, "the N./*half*/of a partition deed."

At the conclusion of the evidence, the trial court concluded that the 1949 survey was not a bona fide effort to determine the intent of the parties in 1916 and rendered judgment for Appellees, Carrell and Wells.

In his first three points of error, Wall contends that the trial court erred when it found that the 31.4 acres in dispute was a part of the south tract of the Wilson survey and that Wall had failed to establish title to the additional acreage. He also contends that the court erred when it refused to make additional findings of fact to support that conclusion. He argues that the·undisputed evidence shows, as a matter of law, that he established title to the additional acreage by honoring the 1916 property description, by successfully locating witness trees marking the west corner, as well as the stumps of witness trees marking the east corner, and by giving dignity to the original monument calls rather than the calculation of acreage.

By attacking the legal sufficiency of an adverse finding on the issues in which he had the burden of proof, Wall must demonstrate on appeal that the evidence conclusively established all vital facts in support of the issue. *See Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989); *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982); *Hickey v. Couchman,* 797 S.W.2d 103, 109 (Tex.App.—Corpus Christi 1990, writ ref'd); *Smith v. Central Freight Lines, Inc.,* 774 S.W.2d 411, 412 (Tex.App.—Houston [14th Dist.] 1989, writ ref'd); *Ritchey v. Crawford,* 734 S.W.2d 85, 86 (Tex.App.—Houston [1st Dist.] 1987, no writ). In reviewing a "matter of law" challenge, we use a two-prong test. We first examine the record for evidence that supports the finding, and ignore all evidence to the contrary. *Sterner,* 767 S.W.2d at 690; *Holley,* 629 S.W.2d at 696. If there is no evidence to support the finding, we then examine the entire record to determine if the contrary proposition is established as a matter of law. *Sterner,* 767 S.W.2d at 690; *Holley,* 629 S.W.2d at 696–97. If the contrary proposition is established conclusively by the evidence, the point of error will be sustained. *Meyerland Comm. Impr. Assoc. v. Temple,* 700 S.W.2d 263, 267 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.).

In making this determination, neither the finder of fact in the trial court, nor this Court, may disregard uncontroverted evidence. *See Kennedy v. Missouri–Pacific R.R.,* 778 S.W.2d 552, 557 (Tex.App.—Beaumont 1989, writ ref'd). Some cases go so far as to hold that the fact-finder's *failure* to find a fact need not be supported by evidence, since they are free to disbelieve the witnesses of the party *bearing the burden of proof. See Yap v. ANR Freight Sys. Inc.,* 789 S.W.2d 424, 425 (Tex.App.—Houston [1st Dist.] 1990, no writ).

Findings of fact in a case tried to the court have the same force and dignity as a jury's verdict. A trial court's conclusions of law may not be challenged for factual insufficiency, however, the trial court's conclusions drawn from the facts may be reviewed to determine their correctness. *City of Clute v. City of Lake Jackson,* 559 S.W.2d 391, 395 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.); *Middleton v. Kawasaki*

*Steel Corp.,* 687 S.W.2d 42, 46 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.); *Zieben v. Platt,* 786 S.W.2d 797, 799 (Tex. App.—Houston [14th Dist.] 1990, no writ); *e.g., Southern States Transp. Inc. v. Texas,* 774 S.W.2d 639, 640 (Tex.1989); *Mercer v. Bludworth,* 715 S.W.2d 693, 697 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.).

Using this standard of review, we will review the evidence that supports the court's judgment. During the course of the trial, much was said about the rules of surveying and what factors took precedence over others. However, Texas law dictates that when a location for a boundary line of land is uncertain, the primary focus is to ascertain the intention of the parties and apply all rules of construction designed to carry out that intention. *Wheeler v. Stanolind Oil Co.,* 151 Tex. 418, 421, 252 S.W.2d 149, 152 (Tex.1952). Upon ascertaining the parties' intention, all other rules must yield to that intention.

Wall argues that the parties' intention is apparent after following the footsteps of the surveyor. According to Wall's argument, the north tract was *intended by the parties* to contain more acreage than the south tract, and Wilson and Beck intended to partition their undivided interest in less than two equal 80–acre tracts. Such an interpretation of the parties intentions is not apparent in any deed on record nor is it consistent with the description of acreage in both 1916 deeds.

In *Blackwell v. Coleman County,* the Supreme Court clearly focuses on determining the intent of the parties, not the intention of the surveyor, when it stated:

> The question seems to have been whether or not the calls for course and distance or those for lines of older surveys should prevail. Upon this question we are of the opinion that the testimony of the surveyor, stating his intention in making the survey, was not admissible. In determining the location of land in such cases the courts seek to ascertain the true intention of the parties concerned in the survey. But the intention referred to is not that which exists only in the mind of the surveyor. It is defined as that which may "be gathered from the language of the grant" or as "the intention apparent on the face of the grant" ... or "the legal meaning of the language of the patent when considered in the light shed upon it by the acts constituting the survey."

*Blackwell v. Coleman County,* 94 Tex. 216, 59 S.W. 530 (1900) (citations omitted). In circumstances such as this, when a surveyor conducts two surveys on adjoining property, the presumption is so strong that the surveyor would not intentionally give conflicting evidence, such fact would have to be proven by conclusive evidence. *Findlay Et Al. v. The State of Texas,* 113 Tex. 30, 250 S.W. 651, 653 (Tex.1923).

In this case, all of the conveyances of the south tract described the boundary line consistent with the description in the 1916 deeds rather than the boundary described in the 1949 survey. The opinions of the various surveyors who testified at trial were also far from conclusive evidence to prove that the 160 acres was unequally divided. Even though Emerson testified that he found the same type of trees further south than the distance described in the 1916 deed, he failed to mention whether the trees had any markings to verify that they were, in fact, monuments for the western corner of the boundary. Traveling the course and distance east of these witness trees, Emerson and Barnum found "stump holes" of what they believed to be the original witness trees for the east corner. There was no evidence they made any effort to proceed further north of the east corner to determine whether they could find other trees that would verify the original monuments.

Furthermore, simply because the marks cannot be located on the grounds, we cannot necessarily conclude as a matter of law that the surveyor failed to mark a corner. *See Standefer v. Vaughan,* 219 S.W. 484, 489 (Tex.Civ.App.—Amarillo 1920, no writ). If ambiguity exists on the face of the surveyor's field notes, or arises only after the notes are applied on the ground, the circumstances surrounding the intent of the parties still controls, and all else must yield to and be governed by this intent. *Thomas Jordan*

*Inc. v. Skelly Oil Co.*, 296 S.W.2d 279, 291 (Tex.Civ.App.—Texarkana 1956, writ ref'd n.r.e.). Here, the surveyor in 1916 described the original monuments with such particularity that it would be just as reasonable to conclude that the original monuments were no longer there after 32 years as it would be to conclude that the course and distance described by the surveyor was incorrect because the monuments could not be found.

Considering the evidence in the light most favorable to the trial court's findings, we conclude that it had ample (though conflicting) evidence, to find that: (1) the 160 acres of the Wilson survey was partitioned in equal 80–acre tracts; (2) that the 1916 boundary line, as described, was correct even though the original monuments could not be found; and (3) the 1949 survey did not reflect the manifest intention of Wilson and Beck. Thus, Wall failed to conclusively prove title to the 31.4 acres.

■ Next, Wall contends that the court erred when it failed to make additional findings of fact and conclusions of law requested. The court's findings of fact and conclusions of law are set forth below:

### Findings of Fact

1. The land in controversy is a part of the 160 acre tract patented to George Wilson in 1879, and the description in such patent was a valid description closing the tract of land and calculating out to 160 acres.

2. On November 27, 1916, such 160 acres was partitioned between George Wilson and Nathan Beck, so that George Wilson received the north 80 acres and Nathan Beck received the south 80 acres.

3. In 1917, W.A. Wall (the father and predecessor in title of Dorwayne Wall) received a deed to the north 80 acres which had been partitioned to George Wilson, and such deed contained the same description contained in the November 27, 1916 partition deed to George Wilson referred to above.

4. Both deeds referred to immediately above made a north-south call of 700 varas.

5. In 1949, a surveyor hired by the Wall family re-surveyed such Wall 80 acre tract, and changed the north-south call to 800 varas, resulting in an increase in acreage from 80 acres to 111.4 acres.

6. From 1916 to 1949, the Wall family acknowledged ownership of only 80 acres and paid taxes on such amount of acreage.

7. The Nathan Beck heirs conveyed a 48 acre tract of land to Mr. Branham and a 32 acre tract of land to Defendant Carrell, thus comprising the south 80 acres of the 160 acre tract referred to in 1 and 2 above.

8. Burl Youngblood surveyed the 32 acre tract in 1990 and found that it contained 31.0616 acres, and had re-surveyed the 48 acres and found that it contained almost exactly 48 acres, confirming that the original 160 acre tract described in the patent actually contained nor more than 160 acres.

9. If the position of the Plaintiff that his family's re-survey in 1949 was correct, this would change the acreage in the original "north 80 acres" to 111.4 acres, and would change the acreage in the original "south 80 acres" to 48.6 acres.

10. The intention of the original parties to the partition, George Wilson and Nathan Beck, was that the 160 acres was to be divided equally, so that George Wilson received the north 80 acres and Nathan Beck received the south 80 acres.

11. The land in controversy is a part of the south 80 acres which was partitioned as set forth in 10 above.

12. Plaintiff has not shown an open, notorious and hostile claim necessary to take the land in controversy from Defendants by any applicable statute of limitation.

13. At the request of Plaintiff and without an order of the Court, Louisiana–Pacific Corporation withheld sums of

money (including some money from timber not cut from the disputed tract) which would otherwise have been payable to Troy Carrell and/or Frances Carrell.

### Conclusions of Law

1. Plaintiff has failed to establish title to the land in controversy, as Plaintiff has failed to prove that the land in controversy was a part of the 80 acres tract conveyed to W.A. Wall in 1916.

2. Plaintiff has failed to establish limitation title to the land in controversy under any applicable statute of limitation.

3. Defendants Troy Carrell and Frances Carrell are entitled to the sums of money previously withheld by Louisiana–Pacific Corp.

Rule 298 of the TEXAS RULES OF CIVIL PROCEDURE reads as follows:

**Rule 298—Additional or amended findings of fact and conclusions of law.**

After the court files original findings of fact and conclusions of law, any party may file a request for specified additional or amended findings of fact or conclusions. The court shall file any additional or amended findings and conclusions that are *appropriate* within 10 days after such request is filed, and cause a copy to be mailed to each party to the suit. *No findings of fact or conclusions of law shall be deemed or presumed by any failure of the court to make additional findings or conclusions.*

(Emphasis added.)

TEX.R.CIV.P. 298. Wall's requests for additional findings of fact and conclusions of law asked the court to make findings and conclusions that were contrary to or evidentiary of the court's previous findings and conclusions. When additional requested findings of fact involve detailed statements of the evidence heard by the trial court, the trial court is not required to make these findings if they would be contrary to its original findings and are properly refused. *Fanning v. Fanning,* 828 S.W.2d 135, 151–52 (Tex.App.—Waco 1992), *reversed on other grounds,* 847 S.W.2d 225

(Tex.1993). Accordingly, the court properly refused Wall's request to make the additional findings and conclusions. Points one, two, and three are overruled.

In points of error four through eight, Wall contends that Carrell and Wells lack standing to challenge his claim for title to the 31.4 acres. In these points, Wall argues that Wells and Carrell: (1) failed to prove that they held under any deed that described or referred to a common boundary line; (2) failed to prove chain of title for the Nathan Beck heirs; (3) failed to prove that Branham was record owner of 48 acres in the south tract; and (4) failed to prove that Carrell was record owner of 32 acres in the south tract. Relying on the "best evidence" rule, Wall contends that the court erred when it overruled his objections to testimony of witnesses regarding various conveyances of property in the south tract when they did not have personal knowledge of the facts.

First, Wall argues that Carrell and Wells failed to introduce any proof that they were record title owners of the land in dispute. He also complains that the court improperly allowed Beck to state conclusions concerning heirship and title ownership of the south tract. Beck testified that he acquired his property by obtaining several deeds from the Beck heirs who had undivided interests. No other evidence was offered to verify that Wells or Carrell were record owners of the south tract.

 A trespass to try title action is a suit to recover possession of land that has been lawfully withheld from the true owner. *Stanolind Oil & Gas v. State,* 136 Tex. 5, 133 S.W.2d 767, 145 S.W.2d 569, 570 (1940). The suit establishes an effective procedure by which rival claims to title of land can be adjudicated by a person who has the right of immediate possession. When a controversy arises to title or right to possession, this procedure is employed to test almost all manner of conflicting claims. *Id.* To maintain an action of trespass to try title, the person bringing the suit must have title to the land sought to be recovered. *Brownlee v. Sexton,* 703 S.W.2d 797, 799–800. The right to recover depends on the strength of his own title, not the weaknesses of the title of his adver-

sary. *Id.* The defendant is not required to show title in himself, nor may the plaintiff rely on the defendant's failure to do so. *Id.* Although a given defendant may have specially pled a title to which he has failed to establish, the plaintiff is not entitled to recover unless the plaintiff's own title is effectively disclosed. *Id.*

In this case, the issue is whether Wall established title to the disputed strip. Wall put at issue his ownership in the property. There is no doubt that Wall established, through his chain of title, ownership of the north 80 acres of the Wilson tract. The court found that Wall failed to establish title to the additional 31.4 acres by using the 1949 survey. It was not necessary that Carrell and Wells establish title to the disputed tract.

Wall then complains that the property description in the deed that conveyed property from J.S. Busby to Troy and Frances Carrell only referred to a property description in another deed conveying property from R.E. Busby to J.H. Busby. However, the courts of this state have uniformly held that a property description in a deed is not the exclusive manner to identify the land, but is one of several means that can be used to identify the property to be conveyed. *Broaddus v. Grout,* 152 Tex. 398, 400, 258 S.W.2d 308, 309–10 (1953). The property description can be found within the deed itself, or can refer to some other existing writing, or can be found in other available data. *Id.* Extrinsic evidence is admissible in trial to identify the land from sources other than the deed itself. *Id.* Youngblood, testifying as an expert, said that he was able to survey the property Carrell and Wells owned by examining deeds and other instruments in the County Clerk's records. *See* Tex.R.Civ.P. 703. His testimony was some evidence of how the property claimed by Wall overlapped with Carrell's and Well's property. Points four, five, six, seven, and eight are overruled.

In points nine, ten and eleven, Wall maintains that Carrell and Wells were estopped to deny his title to the 31.4 acres and that the court erred when it failed to make a finding of fact and conclusion of law in support of his position. After the 1949 survey, Lon Albritton, who claimed title under Nathan Beck, filed a trespass to try title suit against Wall's father, but dismissed it. Having notice that the description for the common boundary line was in dispute in 1950, Wall argues that everyone who claimed title under Nathan Beck failed to diligently seek correction of the 1916 partition deed in a court of equity and, as a result, are now estopped to deny his title and are barred by laches and limitations from doing so. We do not agree.

Wall had a duty to seek equitable relief when he discovered that there was a mistake in the boundary dispute. In equity, a party that unilaterally re-surveys property and finds that he has more land than he originally thought he had, cannot place a duty on the party whose land would have been taken as a result of the re-survey to bring any type of suit to correct the discrepancy. Wall cites no case law to the contrary. Finding no merit in Wall's argument, points nine, ten, and eleven are overruled.

In points twelve, thirteen, fourteen and fifteen, Wall contends the court erred when it rendered judgment against him and failed to make findings of fact and conclusions of law that the boundary line claimed by him was conclusively established by acquiescence. Wall cites *Anderson v. Atlantic Oil Prod. Co.,* 83 S.W.2d 418 (Tex.Civ.App.—Texarkana 1935, writ ref'd), in support of his position. However, *Anderson* is not persuasive because, there, the evidence presented at trial on the issue of acquiescence was undisputed, and in this case, the evidence is disputed. Other cases cited by Wall, *Yates v. Hogstrom,* 444 S.W.2d 851 (Tex.Civ.App.—Houston [14th Dist.] 1969, no writ); *Allen v. Robbins,* 347 S.W.2d 362 (Tex.Civ.App.—Austin 1961, no writ), were cases in which the trial court heard conflicting evidence and decided that sufficient evidence was presented to establish adverse possession and acquiescence.

No doubt, when a boundary line between adjoining owners is uncertain or controverted, that boundary line may be established by implied agreement, and if the

implied agreement is disputed, acquiescence may be shown by circumstantial evidence. *Fulford v. Heath,* 212 S.W.2d 649, 654 (Tex. Civ.App.—Amarillo 1948, writ ref'd n.r.e.). The person claiming that the common boundary was established by acquiescence must show that he has title to the tract and that the owners of the property on both sides of the line agreed to, acquiesced in, or recognized such line as the boundary. *Davis v. Miers,* 308 S.W.2d 277, 280 (Tex.Civ.App.—Eastland 1957, writ ref'd n.r.e.) (where a jury found acquiescence by the defendant and his predecessors in a claimant's claim that the fence separating their properties was the true boundary line between them). The court found that this could not support a judgment for plaintiffs in a trespass to try title suit where they introduced no evidence to establish their record of title, and the jury had found against them in their claim of adverse possession.

■■■■ Although acquiescence and recognition may be evidence of an agreement fixing a boundary and may support an inference or presumption that there has been such an agreement, this presumption will not apply when induced by mistake, or when the true boundary is established conclusively by undisputed evidence. *Kirby Lumber Corp. v. Lindsey,* 455 S.W.2d 733 (Tex.1970). When there is no doubt as to the true location of the boundary line, mere proof of acquiescence in an erroneous line will not support a verdict. *Id.* Acquiescence is a fact issue, not an issue of law; therefore, the weight to be given the evidence is for the trier of fact, in this case, the judge. In reviewing the evidence, we are required to accept all evidence that supports the judgment as true.

■■■ At trial, the evidence presented a conflict between the surveyor's calls for distance and the call for locating the original monuments marking the west corner at 700 varas. The testimony of the various surveyors was conflicting. As the fact-finder, the trial court heard all the evidence, weighed the credibility of the witnesses, and considered the actions of the parties, as well as their intentions. We cannot find error in his

findings. Therefore, points of error twelve and thirteen are overruled.

Failing to show record title, estoppel, or acquiescence, Wall also attempted to prove that he had acquired the property in dispute by adverse possession. However, the testimony at trial concerning the use of the property is significant, but conflicting. According to Wall, in 1923, when he was five years old, the north tract was open land and occasionally farmed by Sam Sheard, a share cropper who lived nearby. From 1929 to 1936, Wall's father began farming the land himself and built terraces for soil conservation. Until the late 40's or early 50's, the area where the 160 acres was located was primarily an open range, which would have allowed livestock to roam freely, except where the land was adequately fenced. After the 1949 survey, Wall's father began making some improvements on the north tract. His father built a barn and his mother sold timber, but neither of these activities were proven to be on the land in dispute. Wall's father also allegedly extended the fence line and planted pine seedlings in 1955, but whether this was done on the disputed strip of land, again is unclear. However, it is clear that Wall's mother executed mineral leases to the 111.4 acres four times.

Mrs. Ethel Sheard Beard's testimony was consistent with Wall's testimony. Beard lived with her family adjacent to the Wilson "north tract" until 1932 when she married and moved. She confirmed that her father was a sharecropper and farmed the Wall tract during that time. Although she remembered a fence at or near the strip of land in dispute, she was not sure whether she remembered a partial fence or whether she remembered a continuous fence line. When questioned concerning cattle raising, she first stated that the property was an open range but that the cows roamed "on the outside" of the range, which presumably means outside of the fenced area. However, later she admitted that the cows also roamed the open range, at least "part of the time, anyway."

Other witnesses also familiar with the north tract gave conflicting testimony. Carrell testified he had grown up nearby, had been a timber contractor for over 40 years,

and was not aware that the property had ever been farmed or been used to graze cattle. He knew that Wall's mother had cut timber from the north tract, but was not aware that any timber had been cut from the disputed strip of land. He described the fence that Wall had built as a partial fence that was not capable of turning cattle. Wells also confirmed Carrell's testimony that there was very little fence on the disputed boundary line, and what little fence there was, could not turn cattle.

J.H. Busby purchased 16 acres of the south tract in 1951 and Dean Brantley purchased 48 acres of the south tract in 1974. Both men testified that they were never aware that the disputed strip had ever been farmed or had cattle on it, or that any adverse claim was being made by Wall or his predecessors in title. All of the witnesses confirmed that there were never any "No Trespassing" or "Posted" signs on the disputed strip of land.

After Wall's father died in 1960, none of the Wall family lived on the north tract, but they turned the barn into a "camphouse" and occasionally used it as a family retreat. Wall and his predecessors in title paid taxes on 80 acres until the 1949 survey, and thereafter paid taxes on 111.4 acres. However, the owners of the south 80–acre tract and their predecessors in title continued to pay taxes on approximately 80 acres.

In points fifteen, sixteen, and seventeen, Wall contends that, because he had established adverse possession as a matter of law, the court erred when it failed to enter judgment in his favor and make findings of fact and conclusions of law in support of that judgment. He argues that the overwhelming evidence shows that he, and those under him, have established title to the land in dispute by virtue of having met the requirements of the five, ten, and twenty-five year adverse possession statutes.

█ The applicable sections of the TEXAS CIVIL PRACTICE AND REMEDIES CODE are:

**Section 16.025. Adverse Possession: Five–Year Limitations Period.**

(a) A person must bring suit not later than five years after the day the cause of action accrues to recover real property held in peaceable and adverse possession by another who:

(1) cultivates, uses, or enjoys the property;

(2) pays applicable taxes on the property; and

(3) claims the property under a duly registered deed.

(b) This section does not apply to a claim based on a forged deed or a deed executed under a forged power of attorney.

**Section 16.026. Adverse Possession: 10–Year Limitations Period.**

(a) A person must bring suit not later than 10 years after the day the cause of action accrues to recover real property held in peaceable and adverse possession by another who cultivates, uses, or enjoys the property.

(b) Without a title instrument, peaceable and adverse possession is limited in this section to 160 acres, including improvements, unless the number or acres actually exceeds 160. If the number of enclosed acres exceeds 160 acres, peaceable and adverse possession extends to the real property actually enclosed.

(c) Peaceable possession of real property held under a duly registered deed or other memorandum of title that fixes the boundaries of the possessor's claim extends to the boundaries specified in the instrument.

Section 16.027. Adverse Possession: 25–Year Limitations Period Notwithstanding Disability.

A person, regardless of whether the person is or has been under a legal disability, must bring suit not later than 25 years after the day the cause of action accrues to recover real property held by peaceable and adverse possession by another who cultivates, uses, or enjoys the property.

TEX.CIV.PRAC. & REM.CODE ANN. §§ 16.025, 16.026, and 16.027 (Vernon 1992). "Adverse possession" as defined in Section 16.021 is "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person." A

party seeking to establish title by adverse possession has the burden to prove every fact necessary to that claim by clear and satisfactory evidence. *Orsborn v. Deep Rock Oil Corp.,* 153 Tex. 281, 286, 267 S.W.2d 781, 787 (1954). This admonishment requires a court to exercise great caution in weighing the evidence, although it does not replace the preponderance-of-the-evidence standard. *Rhodes v. Cahill,* 802 S.W.2d 643, 644 n. 2 (Tex.1990). To establish title through adverse possession, "the possession must be of such character as to indicate *unmistakably* an assertion of a claim of *exclusive* ownership in the occupant." *Rick v. Grubbs,* 147 Tex. 267, 269, 214 S.W.2d 925, 927 (1948) (emphasis in original).

In *Rhodes,* the court held:

It is well settled, that where a party relies upon naked possession alone as the foundation for his adverse possession claim, it must be such an actual occupancy as the law recognizes as sufficient, if persisted in for a long enough period of time, to cut off the true owner's right of recovery.

It has been said that such possession must not only be actual, but also visible, continuous, notorious, distinct, hostile (*i.e.,* adverse), and of such a character as to indicate unmistakably an assertion of a claim of ownership in the occupant.

*Rhodes,* 802 S.W.2d at 645.

Adverse possession requires that Wall prove the actual possession with evidence of visible appropriation of the land. In determining what will amount to actual possession of land, considerable importance is attached to the nature of the land and its uses.

As we understand the record, the strip of land in dispute, as well as the balance of acreage on Wall's property was virtually unoccupied after 1936. There was testimony that a barn was built on the north end of the Wall property in 1950 was later converted into a residence, but Wall's father and mother only lived in it for about a month prior to the father's death. After that time, there was only occasional use made of the residence by Wall's family. Evidence of only occasional visits on property is insufficient to establish an adverse claim, even though some improvements have been made. *Weatherred v. Kiker,* 357 S.W.2d 182, 184 (Tex.Civ. App.—Amarillo 1962, writ ref'd n.r.e.).

It appears that Wall and his predecessors may have also used the property for timber cultivation. The Walls planted trees in 1955 and Wall's mother allegedly sold timber off of 111.4 acres in 1980, which Wall proved by a timber deed. Carrell, however, testified that in his opinion there had been no cutting in the disputed area in 1980, because of the lack of stumps and the size of the trees remaining on the strip of land.

The testimony concerning other uses of the disputed property was also conflicting. Walls said that cattle were allowed to graze there by permission; however, there were other witnesses who testified that cattle were never known to be on the property. The payment of taxes based on the resurvey was also not conclusive. Wall paid taxes on 111.4 acres after 1949, but the owners of the south tract also continued to pay taxes on 80 acres.

The fence was the strongest evidence Wall presented to support a claim to adverse title on the boundary but, again, the evidence is conflicting. Although Wall testified that the fence was maintained at all times and was capable of turning cattle, there was other testimony given that it was not capable of turning cattle. Mere fencing of land will not constitute sufficient possession if unaccompanied by actual occupancy or open use. *Niday v. Cochran,* 42 Tex.Civ.App. 292, 93 S.W. 1027 (Tex.Civ.App.1905, no writ). The fence must have been designedly built to enclose cattle, otherwise it could have been deemed a "casual fence." *Orsborn,* 267 S.W.2d at 786. There were also not any "No Trespassing" or "Posted" signs on the fence or the disputed property.

Only in rare instances is a court justified in holding that adverse possession has been established as a matter of law. *Bywaters v. Gannon,* 686 S.W.2d 593, 595 (Tex.1985). It generally is a question of fact. *Id.* After reviewing the record, we hold that Wall failed to conclusively establish limitation title to the land in controversy under any applicable statute of limitation and conclude the

there was sufficient evidence to support the judgment entered by the court. Points 15, 16, and 17 are overruled.

The judgment of the trial court is **affirmed.**